Rodney D. BALL, Sr., et al., Plaintiffs,

v.

JOY MANUFACTURING CO., a Pennsylvania Corporation, Defendant.

Robert E. THOMPSON and Geneva Ann Thompson, Plaintiffs,

v.

JOY TECHNOLOGIES, INC. (formerly Joy Manufacturing Company), a Pennsylvania Corporation, Defendant.

William R. LEVITT and Shirley Levitt, Plaintiffs,

v.

JOY TECHNOLOGIES, INC., a Delaware Corporation (formerly Joy Manufacturing Company, a Pennsylvania Corporation), Defendant.

Civ. A. Nos. 1:87-0268, 1:88-0133 and 1:88-1691.

United States District Court, S.D. West Virginia, at Bluefield.

Sept. 18, 1990.

As Amended Nov. 8, 1990.

**1346**

James B. Lees, Jr., James A. McKowen and David L. Stuart, Hunt & Wilson, Charleston, W.Va., for plaintiffs.

Dennis C. Sauter, Jackson & Kelly, Charleston, W.Va., for defendant.

## MEMORANDUM ORDER AND OPINION

HALLANAN, District Judge.

This matter is before the Court via the Defendant's motion for summary judgment, the Plaintiffs' motion to certify questions of West Virginia law, and the Plaintiffs' motion to reconsider and/or amend judgment. After careful consideration of the pleadings filed relative thereto, as well as the oral argument of counsel addressing the motion for summary judgment, the Court is now prepared to render its ruling. For the reasons listed below, it is hereby ORDERED that the Defendant's motion for summary judgment is GRANTED, the Plaintiffs' motion to certify questions of West Virginia law is DENIED, and the Plaintiffs' motion to reconsider and/or amend judgment is DENIED.

### SUMMARY OF FACTS

On or about the year of 1965, the Defendant Joy Manufacturing Company [hereinafter "Defendant"] began to manufacture and sell mining equipment. The Defendant utilized motors in its mining equipment which were manufactured and initially serviced by Reliance Electric and Engineering Company of Cleveland, Ohio. Some of these motors used a substance known as polychlorinated biphenyls [hereinafter "PCBs"] as a coolant.

In December, 1968, the Defendant purchased a building in Bluefield, West Virginia, from Hart Electric in part for the purpose of repairing and rebuilding these motors itself. Part of the repairing and rebuilding process required the Defendant to degrease various parts of the motors. The vapor degreasor it used for this purpose utilized trichloroethylene [hereinafter "TCE"] as a solvent.

In 1975, the Defendant began construction of a new facility in Bluefield, Virginia. The new plant was completed in 1977 and all operations and activities were transferred there by March, 1978, except for the tear-down and cleaning of fluid filled motors which continued at the West Virginia plant until September, 1980. A new vapor degreasor which used 1,1,1 trichloroethane, rather than TCE, was purchased for use at the Virginia plant. The Defendant had been a subscriber to the West Virginia Workers' Compensation plan and contemporaneously with the move to Virginia became a subscriber to its Workers' Compensation plan. The Bluefield, West Virginia, facility was subsequently sold to Elwin Aliff.

PCBs have been manufactured and used extensively throughout the world since the late 1920's. The use of PCBs as a coolant in underground mining motors offered unique safety advantages because of its high flash point. Its use for this purpose was designated as permissible by the Mine Safety and Health Administration. However, in the late 1960's the scientific and medical communities discovered that PCBs were widely disbursed and persistent in the environment. This discovery led the communities to begin studies to determine whether exposure to PCBs causes any potential adverse human health effects.

In October, 1976, Congress passed the Toxic Substances Control Act [hereinafter "TSCA"]. Implementing regulations concerning PCB marking and disposal were established in February, 1978. A PCB ban

rule, with an effective date of July, 1979, was promulgated in May, 1979. In addition to finalizing regulations implementing the provisions of TSCA, it also incorporated, recodified and modified the PCB marking and disposal rules.

In October, 1985, various samples were taken at and around the Bluefield, West Virginia site by Elwin Aliff, the Defendant, and the West Virginia Department of Natural Resources to be tested and analyzed for PCB contamination. The various tests conducted on the samples revealed PCB contamination. On January 23 and 24, 1986, the United States Environmental Protection Agency [hereinafter "EPA"] conducted an inspection at and around the site. As a result, on February 20, 1986, Region III of the EPA issued a Superfund Cleanup order to the Defendant, Elwin Aliff and Lin–Elco Corporation of which Elwin Aliff was president. Part of the EPA's findings of fact and conclusions of law included the following:

10. PCBs are toxic chemicals which are extremely stable and persistent in the environment. In laboratory animals, PCBs have been demonstrated to cause cancer, suppression of the immune system, liver damage, birth defects, impairment of reproductive capacity, and other illnesses and injuries. In aquatic organisms, PCBs are toxic and can cause death, reduced growth and impairment of reproductive capacity and other biological functions. PCBs are also toxic to humans, and can cause liver damage, adverse dermatological effects and changes in other biological functions. PCBs are regarded by EPA as a probable human carcinogen. Exposure to PCBs results in bioaccumulation, which means that the substance accumulates over time in living tissues in concentrations higher than the concentrations to which the organisms are exposed in the environment.

.    .    .    .    .

14. The disposal of PCBs at and around the Route 52 site [West Virginia plant],

the presence of PCBs off-site and the potential migration of additional PCBs off-site all constitute releases and threatened releases of hazardous substances into the environment.

15. In order to protect the public health, welfare, and the environment, it is necessary that certain actions be taken to abate the release and threatened release of hazardous substances from the Route 52 site.

Exhibit 2 to Plaintiffs' Opposition to Defendant's Motion For Summary Judgment.

In response to the Superfund Cleanup order, the Defendant retained Remcor, Inc. to conduct a remedial clean-up of the site. Prior to this time, in 1984, Elwin Aliff had filed suit against the Defendant in the United States District Court for the Southern District of West Virginia alleging false representation in conveying the building. In September, 1987, Elwin Aliff was awarded a jury verdict against the Defendant.

Plaintiffs allege that "[b]ecause of the publicity surrounding Mr. Aliff's suit and Remcor's remedial cleanup of Joy's former facility in Bluefield, West Virginia, many employees and former employees of Joy realized for the first time that during their employment with the defendant they had been exposed to highly toxic, carcinogenic chemicals without adequate ventilation, protective equipment, sanitation or safety instruction." Plaintiffs' Opposition To Defendant's Motion For Summary Judgment at 3.

The leading case in this consolidated action, *Ball, et al. v. Joy Manufacturing Company*, Civil Action No. 1:87–0268, consists of the claims of sixteen (16) Plaintiffs [1] all of whom are present or former employees of the Defendant and was filed on March 17, 1987, in the United States District Court for the Southern District of West Virginia. By Order of this Court entered on August 10, 1989, the *Ball* case was consolidated with *Thompson v. Joy Technologies, Inc.*,[2] Civil Action No. 1:88–

---

**1.** The Plaintiffs being Rodney D. Ball, Sr., Harless V. Belcher, Junior F. Billings, Lynn S. Combs, Ronald J. Davis, Theodore H. Harris, Jerry W. Holmes, Eddie D. Kirk, Larry E. Oliver, Gerald H. Proffitt, Donald R. Rolen, Frank

E. Roop, Jr., Jessie F. Stamper, Roger L. Taylor, Horace G. White, Jr., and Johnnie Williams.

**2.** The Plaintiffs being Robert E. Thompson and his wife, Geneva Ann Thompson. The change

0133, and *Levitt v. Joy Technologies, Inc.*,[3] Civil Action No. 1:88–1691. In total, this consolidated action includes twenty (20) Plaintiffs. Eighteen (18) of whom have actually been employees of the Defendant [hereinafter "Occupational Plaintiffs"], while the other two (2) are spouses of two (2) of the Occupational Plaintiffs [hereinafter "Spouse Plaintiffs"].

The Occupational Plaintiffs claim that their exposure to these allegedly toxic chemicals while working for the Defendant constitutes a physical injury.[4] Because of this "injury," the Occupational Plaintiffs claim they now have an increased risk of developing various illnesses, including cancer. While not seeking damages for the alleged increased risk of future disease, in and of itself, they do seek damages for their emotional distress caused by their "injury" and for the costs of medical monitoring during the remainder of their lifetime which they claim is necessitated by such injury. The Occupational Plaintiffs allege that such exposure occurred in both West Virginia and Virginia. The Spouse Plaintiffs both claim damages for loss of consortium, while in addition, Spouse Plaintiff Thompson claims damages for emotional distress and medical monitoring alleging that she was also exposed to these chemicals, i.e., injured, because her husband carried them home on his body, clothing and other personal effects.

The parties agree that it is widely accepted today in the medical and scientific communities that exposure to PCBs can cause a skin disorder known as chloracne.

Chloracne, however, is reversible and is not malignant. Plaintiffs in part allege that a genuine question of material fact exists as to whether the chemicals involved in this case cause other adverse human health effects, such as cancer, and that therefore Defendant's motion for summary judgment should be denied on that basis alone. Unsurprisingly, both sides have marshalled an impressive list of expert witnesses to support their various positions. Plaintiffs claim that at trial their experts "... will testify, to a reasonable degree of medical certainty, based on their general knowledge and experience, on animal studies,[5] clinical work, and human epidemiological studies, that PCBs cause a variety of adverse health effects in human beings, including cancer, ... liver damage and impairment of liver function, ... and impairment of the immune system." Plaintiffs' Opposition To Defendant's Motion For Summary Judgment at 7 (citations omitted).

Defendant on the other hand contends that it will establish at trial that:

[a]fter years of investigation, it is generally accepted in the medical and scientific community that they only known adverse human health effects associated with occupational exposure to PCBs, is a skin condition known as chloracne. The reported levels of PCBs for the plaintiffs are orders of magnitude below the levels observed by clinical manifestation of chloracne. Plaintiffs also allege exposure to by-products of PCBs, polychlorinated dibenzofurans ("PCDFs") and poly-

---

in the Defendant's name reflects the fact that the Defendant changed its name and became incorporated in Delaware during the interim following the initiation of the *Ball* suit.

3. The Plaintiffs being William R. Levitt and his wife, Shirley Levitt.

4. While earlier there was a great deal of confusion between the parties as well as this Court as to what the Plaintiffs were claiming as their injury, counsel for the Plaintiffs both strenuously and repeatedly made it clear during oral argument on the summary judgment motion, which will be discussed more fully infra, that they they are alleging their exposure as their injury.

5. The Court wishes to note that jurisdictions are in disagreement over the admissibility of expert medical or scientific testimony based on animal studies where the reliability of such evidence is contested. Contrast *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823 (D.C.Cir.1988); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir.1987); *In re Paoli R.R. Yard PCB Litigation*, 706 F.Supp. 358 (E.D.Pa.1988); *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1221 (E.D.N.Y.1985) (cases finding such evidence inadmissible or entitled to little weight because of unreliability) with *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529 (D.C.Cir.), cert. denied 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); *Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741 (11th Cir.1986) (cases finding such evidence admissible).

chlorinated dibenzo-p-dioxins ("PCDDs"). Even assuming these by-products were created, which Joy contends they were not, it is likewise generally accepted in the medical and scientific community that the only observed adverse human health effects from occupational exposures to PCDFs or PCDDs is chloracne or other benign reversible skin conditions.... The reported adipose levels for the plaintiffs of these contaminants fall within the ranges for the general population and are substantially below the levels at which the clinical manifestations of chloracne or other minor skin conditions are observed.

Trichloroethylene and Trichloroethane have been widely used in industry as cleaning solvents. It is generally accepted in the medical and scientific community that there are no adverse human health effects associated with chronic low level occupational exposure to either chemical compound, and none of the plaintiffs is at an increased risk of developing future injuries including cancer as a consequence of workplace activities.

Memorandum In Support of Defendant's Motion For Summary Judgment at 5–6.

Plaintiffs also essentially contend that summary judgment is improper because a genuine question of material fact exists as to the knowledge of the Defendant regarding the toxicity of these chemicals and thus as to whether the Defendant intentionally, recklessly or negligently exposed the Plaintiffs to these alleged toxic chemicals. Many exhibits as well as depositions are cited by the parties in relation to the above two issues. What is not disputed at this time, however, as noted above, is that the Plaintiffs, except for Spouse Plaintiff Levitt, are claiming that their exposure to these chemicals is their "injury." None of these Plaintiffs are claiming that they are presently suffering, or have suffered in the past, from any manifestations, symptoms or other injuries caused by their exposure.

This Court held a hearing on Defendant's Motion for Summary Judgment on August 3, 1990, for the purpose of clarifying issues and legal arguments. At such hearing, the following exchanges occurred:

MR. LEES [counsel for the Plaintiffs]: The injury is the exposure, but the manifestation of the injury we are not claiming. So, it's, yes, there is an injury for purposes of the actual exposure and manifestation may come about today or in ten years. We're not dealing in this case with the manifestation of the injury.

THE COURT: So, you're dealing with emotional—

MR. LEES: The emotional distress and the medical surveillance [as] basically protective medicine to pick it up when and if it occurs.

Transcript of Hearing on Defendant's Motion for Summary Judgment [hereinafter "Transcript"] at 5–6.

MR. LEES: ...

It may be a little bit wrongly worded in the pre-trial [order], but all we're saying is one of the two items of damages in this case is the fact that these people, unlike you or I, now have to go to the doctor far more often because of the fact that they have these levels of a toxic substance in their bodies.

The fact that they now have to go to a doctor more often than you and I, the fact that they have to have more tests and complicated tests than you and I because of this exposure is going to cost them out-of-pocket dollars through the rest of their life.

Because the defendant was responsible for that exposure, it simply becomes an item of damages with respect to the surveillance on the—

THE COURT: You're talking now about the medical monitoring.

MR. LEES: I understand. On the emotional distress, the exposure itself, as long as you have the injury or impact, my understanding of the law is emotional distress can be an element of damage recoverable in this case, as in any other case, if you prove the underlying injury or exposure.

We're not suggesting that's somehow a separate action. We're not suggesting it's standing alone out there.

.     .     .     .     .

They are obviously distressed when they are told finally, "You have a level of x amount of a toxic substance in your case." It relates back to the tort. If, in fact, it is a tort, which is recoverable to expose somebody to a toxic chemical, then our position is that emotional distress, just like any other item of damage, is recoverable and it doesn't have any special meaning in terms of this case.

Transcript at 16–18.

Because, for reasons which will be discussed infra, the Court finds that the mere exposure to toxic chemicals is not a compensable injury under the Workers' Compensation Acts or common law of the States of West Virginia and Virginia, there is no need for the Court to discuss in any great detail the evidence presented by the parties regarding the above two disputed issues, i.e., (1) the possible medical causation of adverse health effects, such as cancer, and (2) the knowledge and degree of culpability of the Defendant. Any discussion of these issues and the evidence relevant thereto will be limited to where necessary for the Court's actual holding. The Court will not address its holding.

## MOTION FOR SUMMARY JUDGMENT

The standard for granting summary judgment was discussed by the United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1985). In *Celotex*, the Supreme Court held in part that:

> ... the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no "genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with re-

spect to which she has the burden of proof....

*Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

Of course, all justifiable inferences must be drawn in favor of the nonmoving party, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

■ It is elementary that a United States District Court when acting with diversity jurisdiction must follow the settled law of the state in which it sits. Where such law is unclear or unsettled, a district court must faithfully predict how the highest court of such state would rule if the case were before it. *Kline v. Wheels by Kinney, Inc.*, 464 F.2d 184, 187 (4th Cir. 1972). And as stated by the Fourth Circuit in the opinion of *Washington v. Union Carbide Corp.*, 870 F.2d 957 (4th Cir.1989), "[f]ederal courts are permitted under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and *[United Mine Workers v.] Gibbs*, 383 U.S. [715] at 715, 86 S.Ct. [1130] at 1130, [16 L.Ed.2d 218 (1966) ] to rule upon state law as it presently exists and not to surmise or suggest its expansion." *Washington*, 870 F.2d at 962.

■ If a party's state claim is not one which would be recognized under state law as it presently exists, a federal court cannot according to its own sense of what is best expand such law so as to recognize the claim. It is only where a federal court can reasonably "predict" that the state's highest court applying its presently existing

law would recognize such a claim, that the federal court can do so.

A federal court must also follow the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). West Virginia generally follows the Restatement (Second) Conflict of Laws (1971). A comprehensive choice of law analysis can easily require the greatest amount of a court's effort in a given case, particularly where as here there are multiple plaintiffs, some of whom are domiciliaries of different states, claiming they were injured in more than one state. Here all of the Plaintiffs are domiciliaries of either West Virginia or Virginia, except for one who is a domiciliary of North Carolina but who is presently residing in West Virginia. As noted above, the Occupational Plaintiffs as well as Spouse Plaintiff Thompson apparently claim they were "injured" in both West Virginia and Virginia. Counsel do not argue, however, over what state's or states' substantive law would be applied by the West Virginia Supreme Court of Appeals in this case. Except for the Defendant cursorily claiming that the Virginia Workers' Compensation Act will govern for any occupational exposure which occurred in Virginia, both parties appear to assume that West Virginia substantive law will govern this dispute.

"In general, West Virginia [still] adheres to the conflicts of law doctrine of lex loci delicti." Syllabus point 1 *Paul v. National Life,* 352 S.E.2d 550 (W.Va.1986). The West Virginia Supreme Court of Appeals, however, has on occasion utilized "... the standards set forth in the Restatement [(Second) of Conflicts] to resolve particularly thorny conflicts problems." *Oakes v. Oxygen Therapy Services,* 363 S.E.2d 130, 131 (W.Va.1987). Such occasions of "particularly thorny conflicts problems" have included cases involving complex, or unusual, contractual situations, *see New v. Tac & C Energy, Inc.,* 355 S.E.2d 629 (W.Va.1987); *General Elec. Co. v. Keyser,* 166 W.Va. 456, 275 S.E.2d 289 (1981), and torts which very existence are dependent upon the breath and legality of contracts, *see Oakes,* 363 S.E.2d at 131. *Lee v. Saliga,* 373 S.E.2d 345, 350–52 (W.Va.1988).

That Court's adherence to the lex loci delicti doctrine, however, has been particularly pervasive in "clear-cut cases of physical injury." *Oakes,* 363 S.E.2d at 131. It thus appears that as to the case at bar for the purpose of determining whether the Plaintiffs have suffered an actionable injury under the common law, the West Virginia Supreme Court of Appeals would apply West Virginia substantive law as to those exposures occurring in West Virginia and Virginia substantive law as to those exposures occurring in Virginia unless such application would contravene the public policy of West Virginia. *See Paul,* 352 S.E.2d at 556.

As to the Occupational Plaintiffs, a corollary question arises as to whether they are barred from maintaining a civil action by workers' compensation statutes. In this regard, as to those exposures occurring in West Virginia, it appears obvious that the West Virginia Supreme Court of Appeals would examine the West Virginia Workers' Compensation Act to determine its applicability and preclusive effect if any. By its own terms, the West Virginia Workers' Compensation Act also covers "... persons regularly employed in the State whose duties necessitate employment of a temporary or transitory nature by the same employer without the State...." W.Va.C. § 23–2–1a (1975); *See also* W.Va.C. § 23–2–1(3) (1976).

Here, however, it would appear that once the Defendant sold its West Virginia plant, transferred its operations to Virginia, and subscribed to the Virginia Workers' Compensation Plan, that the West Virginia Workers' Compensation Act would not apply to any exposures occurring to the Occupational Plaintiffs as a result of their employment in Virginia. Certainly at such time, their employment in Virginia could not be found to be merely temporary or transitory under the West Virginia Workers' Compensation Act. *See* W.Va.Code §§ 23–2–1 (1976) and 23–2–1a (1975); *Fausnet v. State Workers' Compensation Com'r,* 327 S.E.2d 470 (W.Va.1985). Thus any applicability of the West Virginia Workers' Compensation Act to the Occupational Plaintiffs would likely arise, if at all,

only as to exposures they suffered as a result of their employment in West Virginia. Hence, it would clearly appear that the West Virginia Workers' Compensation Act is not a bar to the Occupational Plaintiffs' maintaining a civil suit based on those exposures occurring in Virginia.

The inquiry, however, does not end there for the next question becomes whether the Virginia Workers' Compensation Act would constitute such a bar as to those exposures occurring in Virginia. Such an analysis of the Virginia Workers' Compensation Act would appear to be a logical extension of West Virginia's adherence to the lex loci delicti doctrine. As noted above, however, the West Virginia Supreme Court of Appeals will not mechanically apply the lex loci delicti doctrine where an application of the law of the state of injury would contravene the public policy of West Virginia. *See Paul*, 352 S.E.2d at 556; *See also Kelly v. Guyon General Piping, Inc.*, 882 F.2d 108 (4th Cir.1989) (Fourth Circuit stating that the Full Faith and Credit Clause, U.S. Const. Art. IV, Sec. 1, would not require Virginia as the forum to apply the exclusive remedy provisions of another state and predicting that Virginia would not mechanically apply the law of the state of injury to determine whether workers' compensation law provided the exclusive remedy for the particular injury alleged but instead would also look to other considerations such as the purpose of workers' compensation acts and the public policy of Virginia).

However, because the Court finds, for reasons which will be discussed infra, that the same result occurs when applying the substantive law of Virginia as that which occurs when applying the substantive law of West Virginia, an application of Virginia substantive law to those exposures occurring in Virginia would not appear to be in contravention of any public policy of West Virginia. The Court thus believes that the West Virginia Supreme Court of Appeals would so apply the substantive law of Virginia. A discussion of the substantive law of both West Virginia and Virginia is therefore warranted, and it is to this endeavor which the Court now turns.

## I. ARE THE OCCUPATIONAL PLAINTIFFS BARRED FROM BRINGING A CIVIL ACTION FOR DAMAGES BY WORKERS' COMPENSATION STATUTES?

### WEST VIRGINIA LAW

West Virginia Code § 23-2-6 (1974) states in pertinent part that:

Any employer subject to this chapter who shall subscribe and pay into the workmen's compensation fund the premiums provided by this chapter or who shall elect to make direct payments of compensation as herein provided, *shall not be liable to respond in damages at common law or by statute for the injury or death of any employee, however occurring*, after so subscribing or electing, and during any period in which such employer shall not be in default in the payment of such premiums or direct payments and shall have complied fully with all other provisions of this chapter....

(emphasis added). Defendant contends that it was a subscriber to the West Virginia Workers' Compensation fund at the time of the Occupational Plaintiffs' employment at its West Virginia plant. There is no evidence to the contrary or which would establish that the Defendant was in default of its premium payments or was in noncompliance with any provisions of the chapter at such time.

West Virginia Code § 23-2-6a (1949), however, states that "[t]he immunity from liability set out in the preceding section [§ 23-2-6] shall extend to every officer, manager, agent, representative or employee of such employer when he is acting in furtherance of the employer's business and *does not inflict an injury with deliberate intention*." (emphasis added). The "deliberate intention" exception to an employer's immunity from civil suit is discussed in West Virginia Code § 23-4-2 (1969) where it is stated in relevant part that:

If injury or death result to any employee from the deliberate intention of his employer to produce such injury or death, the employee, the widow, widower, child or dependent of the employee *shall have the privilege to take under*

*this chapter, and shall also have a cause of action against the employer, as if this chapter had not been enacted, for any excess of damages over the amount received or receivable under this chapter.*

(emphasis added). This portion of the section has been in effect since the enactment of the Chapter in 1913.

Cases in which employees bring civil actions against their employers based on this deliberate intent exception are commonly known today as "Mandolidis-type actions." This pseudonym is in reference to the opinion of the West Virginia Supreme Court of Appeals in *Mandolidis v. Elkins Industries, Inc.*, 246 S.E.2d 907 (W.Va.1978). In *Mandolidis*, the Court found that:

> ... the phrase "deliberate intent to produce such injury or death" must be held to mean that an employer loses immunity from common law actions where such employer's conduct constitutes an intentional tort or wilful, wanton, and reckless misconduct.... While wilful, wanton, and reckless misconduct are well-established concepts, we wish to make clear that we are using the words "wilful," wanton," and "reckless" misconduct synonymously, and that the conduct removing the immunity bar must be undertaken with a knowledge and appreciation of the high degree of risk of physical harm to another created thereby.

*Mandolidis*, 246 S.E.2d at 914. The Court in *Mandolidis*, also noted a general inclination towards denying summary judgment in such cases, stating that "[w]e are of the view that complicated industrial 'accidents,' wherein the state of mind of company representatives is critical, seldom lend themselves to disposition by summary judgment, and where there is any doubt such a motion should be refused." Id. at 918 [hereinafter "pre–1983 amendment law"].

In 1983, however, amendments to § 23–4–2 took effect which substantially narrowed the *Mandolidis* Court's interpretation of the deliberate intent exception. The West Virginia Legislature made clear that in so doing, it:

> ... intended to create a legislative standard for loss of that immunity of more narrow application and containing more specific mandatory elements than the common law tort system concept and standard of willful, wanton and reckless misconduct; and ... to promote the prompt judicial resolution of the question of whether a suit prosecuted under the asserted authority of this section is or is not prohibited by the immunity granted under this chapter.

W.Va.Code § 23–4–2(c)(1) (1983). To establish such intent, § 23–4–2 now requires that an employee must prove that the employer "acted with a consciously, subjectively and deliberately formed intention to produce the specific result of injury or death to an employee." An employee can only satisfy this standard by establishing either an "actual, specific intent" or five specific elements designated by the section. W.Va.Code § 23–4–2(c)(2)(i) & (ii) [hereinafter "post–1983 amendment law"].

The Defendant contends that in light of the above law, it is clear that an employee or his/her dependent must first bring any claim for compensation for a work-related injury or death under the West Virginia Workers' Compensation Statute. Only then, and only if it can be additionally shown that the employer acted with the deliberate intent to produce such injury or death, can such employee or his/her dependent bring a Mandolidis-type action for any excess of damages received or receivable under the Statute. The Defendant then contends that the post–1983 amendment law would govern this action, but that under either standard the claims of the Plaintiffs must fail because they do not allege an actionable injury nor can they prove that the Defendant acted deliberately or even recklessly for that matter.

The Plaintiffs respond by saying that an exposure is either a compensable injury under the Workers' Compensation Statute or it is not. If an exposure is not a compensable injury under the Statute, then the Statute is not a bar to them bringing an ordinary common law action for damages. If an exposure is compensable under the Statute, they may forego filing compensation claims under the Statute and instead recover all their damages in a Mandolidis-type action. As to the deliberate intent

standard applicable, they contend that because their occupational exposure to the alleged toxic chemicals at the West Virginia plant, i.e., their injury, occurred prior to the 1983 amendment, the pre–1983 amendment law applies. They contend, however, that they can satisfy either.

Because the Plaintiffs claim their exposure rather than their emotional distress as their "injury," this Court believes that under West Virginia law the Plaintiffs' position as to the applicable deliberate intent standard is correct.[6] *Lancaster v. State Compensation Com'r, et al.*, 125 W.Va. 190, 23 S.E.2d 601 (W.Va.1942); *Cline v. Joy Mfg. Co.*, 310 S.E.2d 835, 837 n. 4 (W.Va.1983); *Delp v. Itmann Coal Co.*, 342 S.E.2d 219, 220 n. 1 (W.Va.1986); *Miller v. Gibson*, 355 S.E.2d 28, 31 n. 2 (W.Va. 1987). The West Virginia Supreme Court of Appeals in *Lancaster* stated:

> [b]ecause the relation between the employer and employee, under the Workmen's Compensation Act, is voluntary, it is contractual and the statute becomes an integral part of the contract.... Upon this theory courts generally postulate the rule that as regards an injured employee the time of injury is determinative of whether the earlier or later provisions of the Workmen's Compensation Act apply....
>
> The rule likewise prevails in this jurisdiction....

*Lancaster*, 23 S.E.2d at 602–03.

§ 23–4–2(d) also expressly provides that "[t]he reenactment of this section in the regular session of the legislature during the year one thousand nine hundred eighty-three, shall not in any way affect the right of any person to bring an action with respect to or upon any cause of action which arose or accrued prior to the effective date of such reenactment." The Court needs not, however, make a final determination on this point for while such a ruling could ease the Plaintiffs' burden in establishing the required intent of the Defendant, they still must prove that they have suffered an injury.[7]

This leads the Court to what is properly the initial inquiry—is an exposure to toxic chemicals a compensable injury under the West Virginia Worker's Compensation Statute?[8] For only if the answer to this inquiry is yes, does the Court believe that either deliberate intent standard is necessarily applicable to this action. This conclusion is the result of the Court's theoretical acceptance of the Plaintiffs' argument that if an injury is not compensable under the Workers' Compensation Statute, the Statute is not a bar to an employee, so injured, bringing a common law action against his employer.[9] *Jones v. Rinehart & Dennis Co.*, 113 W.Va. 414, 168 S.E. 482 (1933); *State v. Sims*, 130 W.Va. 430, 43 S.E.2d 805 (1947).

In *Jones*, the highest Court of West Virginia noted that:

> The language of section 2516 [23–2–6] providing that an employer subject to the compensation act, not in default, "shall not be liable to respond in damages at common law or by statute for the injury or death of any employee, however occurring," if considered isolated from the remainder of said section and from all the rest of the act, would sustain the

---

**6.** The Defendant argues that if the Plaintiffs are correct then their cause of action accrued at that time, and they are thus barred from bringing this action by the applicable limitations period. The Plaintiffs, however, claim that the West Virginia Supreme Court of Appeals would apply the "discovery rule" in this situation and, thus they are not barred. Because the Court finds that the Plaintiffs have not suffered an actionable injury, this debate is irrelevant.

**7.** The Court does not believe that the *Mandolidis* Court's disinclination towards granting summary judgment is relevant here, since this Court's decision is not based on the Defendant's "intent" or lack thereof.

**8.** Moreover, it should again be noted in this regard that the Plaintiffs do not claim that they have suffered any disability or incapacity as a result of their exposure.

**9.** Because of the liberal expansion and interpretation of the Workers' Compensation Statute over the years so as to recognize a wide-range of "ailments" as compensable injuries, it is doubtful that this conclusion has much of a practical effect today.

It should also be noted that whether such injury is actionable under the common law is, of course, another question, and one which the Court will address later in the opinion.

contention of the defendants that an action for damages by an employee against an employer for injury arising from the employment may not be maintained even though such injury or disability is not compensable. But the meaning of that clause must not be determined from its cold phraseology alone. Consideration must be given to the background and purpose of compensation acts, to the evils sought to be corrected and the objects to be attained; to the rules of the common law with relation to right of action for industrial injuries and diseases, both occupational and otherwise; to the legislative history of our own act; and to all portions of the act which may be of assistance in determining the legislative intent with respect to the said phraseology of section 2516.

*Jones,* 168 S.E. at 484.

After conducting this inquiry, the *Jones* Court found that because silicosis was not a compensable disease under the Statute, the Statute was not a bar to the plaintiff bringing a civil suit. While the West Virginia legislature has at times responded to *Jones* and its progeny by amending the Workers' Compensation Statute to make compensable "injuries" previously held noncompensable, such as it did with silicosis in 1935, this Court can find no evidence that the legislature has disapproved of the reasoning of the West Virginia Supreme Court of Appeals in the *Jones* line of cases. The Court believes that such reasoning is applicable here.

With this in mind, it appears obvious that the legislature need not grant an exception to a statutorily created immunity where the Statute creating such immunity does not apply in the first place. Thus only if an exposure is an "injury" under the Statute will the Plaintiffs need to meet the requirements of the deliberate intent exception to bring this civil action. A further examination of the Workers' Compensation Statute is therefore warranted.

West Virginia Code § 23–4–1 (1976) states in pertinent part:

Subject to the provisions and limitations elsewhere in this chapter set forth, the commissioner shall disburse the workmen's [workers'] compensation fund to the employees of employers subject to this chapter, which employees have received personal injuries in the course of and resulting from their covered employment or to the dependents, if any, of such employees in case death has ensued, . . . .

For the purposes of this chapter the terms "injury" and "personal injury" shall include occupational pneumoconiosis and any other occupational disease, as hereinafter defined, and the commissioner shall likewise disburse the workmen's [worker's] compensation fund to the employees of such employers in whose employment such employees *have been exposed to the hazards of occupational pneumoconiosis or other occupational disease and in this State have contracted occupational pneumoconiosis or other occupational disease,*

. . . .

. . . . .

For the purposes of this chapter, occupational disease means a disease incurred in the course of and resulting from employment. No ordinary disease of life to which the general public is exposed outside of the employment shall be compensable except when it follows as an incident of occupational disease as defined in this chapter. Except in the case of occupational pneumoconiosis, a disease shall be deemed to have been incurred in the course of or to have resulted from the employment only if it is apparent to the rational mind, upon consideration of all the circumstances (1) that there is a direct causal-connection between the conditions under which work is performed and the occupational disease, *(2) that it can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment,* (3) that it can be fairly traced to the employment as the proximate cause, *(4) that it does not come from a hazard to which workmen would have been equally exposed outside of the employment,* (5) that it is incidental to the character of the business and not independent of the relation

**1356**

of employer and employee, and *(6) that it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.*

... An employee shall be deemed to have contracted an occupational disease within the meaning of this paragraph if the disease or condition has developed to such an extent that it can be diagnosed as an occupational disease.

Claims for occupational disease as hereinbefore defined, except occupational pneumoconiosis, shall be processed in like manner as claims for all other personal injuries.

(emphasis added).

It thus appears to this Court that if the Plaintiffs were presently suffering from cancer or some other disease and could establish through studies and research that such disease is clearly linked to a particular hazard of their workplace, a prima facie case of causation would arise upon a showing that they were exposed to the hazard and are suffering from such disease. *Powell v. State Workmen's Compensation Com'r*, 166 W.Va. 327, 273 S.E.2d 832 (1980) (Court finding lung cancer to be a compensable occupational disease where medical evidence linked the cancer to occupational exposure to asbestos dust); *Hoult v. Workers' Compensation Com'r*, 383 S.E.2d 516 (W.Va.1989) (Court finding renal and pulmonary problems to be compensable occupational diseases which substantially contributed to the employee's death where medical evidence linked the problems to prolonged occupational inhalation of carbon tetrachloride and benzene vapors); *Hannah v. Workers' Compensation Com'r*, 346 S.E.2d 757 (W.Va.1986) (Court finding hearing loss to be a compensable occupational disease where medical evidence linked the loss to occupational noise exposure).

■ In light of the above section and cases, it seems clear that while showing an occupational exposure to a hazard of the workplace is a necessary condition to proving an "injury" compensable under the Workers' Compensation Statute, it is not a sufficient condition alone—rather an employee must establish through medical evidence that such exposure is causally linked to a disease he/she presently suffers. In other words, medical evidence that such exposure can cause a particular disease is not sufficient to establish a compensable "injury" under the Statute without the existence of the disease itself.

The Court has discovered that the date of the last exposure is considered the "date of injury" for several procedural purposes under the Statute—including the establishment of a date for the computation of benefits and the application of benefits (but for the application of benefits only if such date is later than that on which an employee was diagnosed as having a disease or should have reasonably known). *See* §§ 23–4–14 and 23–4–15, respectively. *See also Ford v. State Workmen's Compensation Com'r*, 236 S.E.2d 234 (W.Va.1977); *Anderson v. State Workers' Compensation Com'r*, 327 S.E.2d 385 (W.Va.1985). It is clear, however, when reading the above sections and cases in their complete context, that the mere exposure to a hazard in the workplace for substantive purposes is not sufficient to constitute a compensable "injury." Again, such exposure must be medically linked to a disease presently suffered by the employee or which substantially contributed to his/her death. It is such disease, when the other required elements are proven, that is a compensable "injury" under the Statute.

As noted by the West Virginia Supreme Court of Appeals in the case of *Hobday v. Compensation Com'r, et al.*, 27 S.E.2d 608, 612 (W.Va.1943), which involved a widow's application for death benefits due to her husband's death which she alleged was caused by silicosis contracted during his employment: "[t]he sole remaining question is whether the decedent, after this exposure, did in fact die of 'silicosis' as that term is used in the statute. *It is not the mere exposure to silicon dioxide dust, however harmful, that justifies compensation. The exposure must produce silicosis, which, in turn, must produce the death.*" (emphasis added).

■ The Court, therefore, finds that an exposure to toxic chemicals is not a compensable "injury" under the Workers' Compensation Statute. Such Statute is therefore not a bar to the Occupational Plaintiffs bringing a civil action for damages based on such an exposure. Additionally, because such Statute is not applicable, they need not satisfy the deliberate intent standard which is required under the Statute to bring a Mandolidis-type action, rather they may bring an ordinary, independent common law action for damages.

■ The Court wishes to note, however, that if it had found that an exposure was a compensable injury under the Workers' Compensation Statute and thus that this suit is governed by the requirements of the deliberate intent exception, it would then have granted the Defendant's motion for summary judgment based on the Occupational Plaintiffs' failure to file Workers' Compensation claims.[10]

As noted above, West Virginia Code § 23-4-2 (1969) states in relevant portion:

> If injury or death result to any employee from the deliberate intention of his employer to produce such injury or death, the employee, the widow, widower, child or dependent of the employee shall have the privilege to take under this chapter, and shall also have a cause of action against the employer, as if this chapter had not been enacted, for any excess of damages over the amount received or receivable under this chapter.

(emphasis added). The Defendant contends that the above language dictates that the Occupational Plaintiffs had to file claims for compensation under the Statute before maintaining this Mandolidis-type action. *See Perry v. Beverage,* 121 Wash. 652, 209 P. 1102 (1922). The Defendant argues that such section entitles it to an offset and that the Plaintiffs cannot destroy this right by choosing not to file their claims under the Statute. *See Mooney v. Eastern Associated Coal Corp.,* 326 S.E.2d 427 (W.Va.1984).

In other words, the Defendant contends that allowing employees to forego filing claims under the Statute would force all employers subject to this section to pay a double recovery for the same injury, since they would be getting no offset for the compensation which the employees could have gotten from the Workers' Compensation fund—a fund which each subscribing employer has contributed to through premium payments for the express purpose of compensating employees who have suffered compensable injuries.

The Plaintiffs contend, however, that *Perry* is not even persuasive authority in this jurisdiction because the States of West Virginia and Washington distribute the burden of proof differently—in West Virginia such burden is on the employer while in Washington the burden is on the employee. The Plaintiffs surmise that since it is not their burden to establish the offset they certainly cannot be required to file such claims.

They also make several other arguments, including the following: (1) the statute states that an employee has the "privilege" to take under the chapter, not that it is a prerequisite; (2) the statute states that such action may be brought "as if this chapter had never been enacted," obviously if such chapter had never been enacted there would be no requirement for them to file such claims; (3) because they did not file such claims, any damages they would now get would be "excess"; (4) because the pre–1983 amendment law allowed punitive damages, there would always have been an opportunity to get "excess" damages, thus explaining why the statute utilized the word "excess"; (5) the word "and" is not always used in the conjunctive sense and even assuming that it is so used here it only demonstrates that employees have both options available; and (6) employers will not be paying "twice" because if there are no compensation claims filed

---

10. This particular holding would not apply to Horace G. White, Jr., who is the only Occupational Plaintiff which has filed a Workers' Compensation claim, assuming that such claim is based on his exposure. The particular facts of

his claim and any rulings he has received regarding it have not been made known to this Court. It would also appear that such claim is still in the appeal process.

against them their future premiums will not be increased.

The only grounds of agreement between the parties on this question is that both agree that the use of the word "receivable" only acknowledges that employees or their dependents may receive monthly payments rather than a lump sum payment. As to the above disputed issues, the Court agrees with the Defendant. It is true that West Virginia and Washington distribute the burden differently. In *Mooney*, the West Virginia Supreme Court of Appeals stated that "[a]n employer has the burden of proof because, although its right to credit for the benefits paid or payable is not a remittitur, it is a reduction of an employer's exposure to damages." *Mooney*, 326 S.E.2d at 430–31 n. 3. However, as urged by the Defendant, the mere fact that it is part of its burden of proof does not mean that the Plaintiffs can destroy such right by failing to file their claims under the Workers' Compensation Statute.

Also, the Court does not accept the Plaintiffs' argument that employers will not be paying "twice" because their future premiums will not increase. For while the number of claims made against employers may affect the amount of the employers' future premiums, it does not change the fact that such employers have already as required paid the premiums to have coverage for the suing employees at the time they allege they were injured. As to the other arguments, it is true that the language of the section in this regard is not crystal clear, however, the Court feels that a fair and reasonable reading of such section more readily supports the Defendant's position than the Plaintiffs'. The Court also feels that the following language in *Mooney* implicitly, if not explicitly, supports this view:

> [Preventing the jury from hearing evidence of the compensation benefits awarded] cannot be sustained against the plain language of W.Va.Code, 23–4–2 that provides a *"cause of action ... for any excess of damages over the amount"* of the plaintiff's compensation award. *Implicit is a requirement that a fact finder know what the compensation award will be.*

> Assessment of damages is the jury's job.... Unlike other instances in which the method of adjusting damages has been left to the trial court or the parties, ... in a Mandolidis action, *evidence of the value of compensation benefits must be submitted to the jury with instructions that any verdict for the plaintiff shall be for damages in excess of such benefits.*

Id. at 430 (emphasis added).

The Plaintiffs, however, also make the superficially appealing argument that if employees are forced to file Worker's Compensation claims first, the limitations period for them to file a Mandolidis-type action may run before they get a final award in the Workers' Compensation proceedings. This, however, will certainly not always be true, and where it appears that such will be the situation, as suggested by the Defendant, employees may protect themselves by simply filing the Mandolidis-type action and having it stayed until their awards in the Workers' Compensation proceedings are final.

For all of the above reasons, it is the opinion of this Court that the Plaintiffs could not choose to bring only a Mandolidis-type action and forego filing their claims under the Workers' Compensation Statute. The Court will now briefly discuss whether the Plaintiffs' are barred from bringing a civil action for damages by the Workers' Compensation Act of Virginia.

### VIRGINIA LAW

Virginia Code § 65.1–40 (1968) provides that:

> The rights and remedies herein granted to an employee when he and his employer have accepted the provisions of this Act respectively to pay and accept compensation on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin, at common law or otherwise, on account of such injury, loss of service or death.

The Defendant contends that the above section clearly establishes that the Virginia's Workers' Compensation Act is the exclusive remedy of the Plaintiffs for any injury they received as a result of their employment at the Defendant's Virginia plant. The Defendant additionally notes that the Virginia Act, unlike that of West Virginia, does not provide for a deliberate intent exception.

It is certainly true that the Virginia Workers' Compensation Act does not expressly contain a deliberate intent exception. The United States Court of Appeals for the Fourth Circuit also noted in *Joyce v. A.C. and S., Inc.*, 785 F.2d 1200, 1206 (4th Cir.1986), that "[t]he Supreme Court of Virginia has not yet addressed the question whether an employer's intentional tort gives rise to a cause of action outside of the Act."

In *Joyce*, the plaintiff claimed that he developed pleural effusion and parenchymal asbestosis as a result of his occupational exposure to asbestos insulation. He sought damages for these injuries from both his former employer and various miners and manufacturers of the asbestos products. The district court had dismissed all but one of Joyce's claims against his former employer pursuant to the exclusivity provision of the Virginia Workers' Compensation Act. Joyce argued during his appeal that intentional torts are not within the scope of the Act and therefore are unaffected by its exclusivity provision.

On appeal, the Fourth Circuit noted that many states recognize an intentional tort exception to their Workers' Compensation Acts and that such exception is normally based on the fact that the applicability of such acts are often limited to situations of "injury by accident." The Court stated, however, that the Virginia Act also provides for compensation for occupational diseases and noted that such coverage is not expressly modified by language requiring that the disease be accidentally produced. For this reason, the Court then surmised that an employee's request for damages due to an occupational disease even where intentionally caused would be relegated to a claim under the Act. Id.

The Court then, however, hypothesized that even assuming the Supreme Court of Virginia would recognize an intentional tort exception for injuries and would extend such exception to occupational diseases, "... the conduct alleged would be insufficient to invoke the exception, as applied in those jurisdictions which recognize an exception for intentional torts." Id. at 1207. The Court reached this conclusion by noting that "[t]he Virginia Workers' Compensation Act was modeled after the analogous statute in Indiana. Virginia courts have therefore considered decisions interpreting the Indiana Act in construing the substantially similar statute in Virginia." Id.

The Court thus felt that even in the event that the Virginia Supreme Court would decide to recognize such an exception, it would likely follow the Indiana rule which requires not merely that an intentional act cause the injury but that the act be actually designed to produce such injury. Because Joyce only alleged that his former employer knowingly exposed him to asbestos and not that such exposure was designed to cause asbestos-related diseases, the Court concluded that he had not alleged conduct of his former employer sufficient to invoke the exception.

The above dictum of *Joyce*, however, was taken a step further in *McGreevy v. Racal-Dana Instruments, Inc.*, 690 F.Supp. 468 (E.D.Va.1988), where Judge Ellis of the United States District Court for the Eastern District of Virginia held that the Supreme Court of Virginia would,· given the opportunity, recognize and adopt an intentional tort exception to the exclusivity provision of its Workers' Compensation Act. *But see Haigh v. Matsushita Elec. Corp. of America*, 676 F.Supp. 1332 (E.D.Va. 1987) (Judge Spencer finding it more probable that the Supreme Court of Virginia would not recognize an intentional tort exception to the exclusivity provision of the Act).

Again, however, for essentially the same reasons as discussed above in relation to the West Virginia Workers' Compensation Statute, this Court is of the opinion that

the proper initial inquiry is that of determining the scope of the Virginia Workers' Compensation Act to ascertain whether the Act is applicable in the first instance to the Plaintiffs' claims. Thus, whether or not the Virginia Supreme Court would recognize an intentional tort exception is only relevant here if it is determined that an exposure to toxic chemicals is a compensable injury or disease under the Virginia Worker's Compensation Statute.

Certainly, there are numerous opinions both in Virginia and West Virginia which support the view that Worker's Compensation is the exclusive remedy for an "injury" arising out of and in the course of employment. One such decision is that of *Feitig v. Chalkley*, 185 Va. 96, 38 S.E.2d 73 (1946), in which the highest Court of Virginia discussed the reasoning behind such exclusivity. The *Feitig* Court stated:

> ... [The Workers' Compensation Law] is as essential to industry as it is to labor. It compromises one of the most important branches of law. Upon its effectiveness depends the potential welfare of a large number of employees and their families. It places upon industry as an expense of the business the pecuniary loss, measured by the compensation provided in the statute, attendant upon all accidents to employees within the hazards of the industry. It extends the employer's liability to all accidental personal injuries "arising out of and in the course of the employment," the expense of which is added to the cost of production. The employer surrenders his right of defense on the ground of contributory negligence and the common-law doctrines of the assumption of risk and fellow servants. The rules of evidence are relaxed. The employee surrenders his right to a trial by jury and agrees to accept an arbitrary amount fixed by statute in lieu of full compensation for the injuries sustained. He gains a wider security. The issue of negligence or non-negligence of the employer and the fellow servants is eliminated. Long, costly and delayed litigation is avoided. *A smaller but speedier recovery is guaranteed....*

*Feitig*, 38 S.E.2d at 73–74 (emphasis added). The *Feitig* Court then held that the exclusivity provision of the Act would not apply where an employee was injured while performing the duties of his employer by the negligence of "a stranger to the business."

The Court felt that such injury was "... not truly and inherently within the industrial field." Id. at 74. In reaching this conclusion, the Court relied partly on the earlier decision of *Griffith v. Raven Red Ash Coal Co.*, 179 Va. 790, 20 S.E.2d 530 (1942), in which it had held that the Act left unimpaired the common law right of action against an employer for damages for the personal injury or death of an employee when such injury or death does not arise out of and in the course of the employment.

The *Griffith* Court noted in its analysis that "[a]lthough in derogation of the common law, [the Act] is highly remedial and should be liberally construed in favor of the workman." *Griffith*, 20 S.E.2d at 533. The Court cautioned, however, that "[w]e should remember, too, that 'the common law is not to be considered as altered or changed by statute unless the legislative intent be plainly manifested.'" Id., quoting *Norfolk & Western R. Co. v. Virginian Railway Co.*, 110 Va. 631, 646, 66 S.E. 863, 868.

The Court then reasoned that:

> [The Workers' Compensation Law] deprives the employee or his personal representative of a common-law right of action for damages against the employer in a particular class of cases, that is, where the injury or death is from an accident arising out of and in the course of the employment, *because the Act gives to the employee or his dependent in lieu thereof the right to an award of compensation.* But to adopt the contention of the defendant in error *would deprive the employee or his dependents of a long existing common-law right of action in a large number of cases without giving them anything in return therefor.* Carried to its logical conclusion, an employee, merely because of the relationship existing between him and his employer, would have no remedy whatever for an injury sustained while he was

working off duty and far removed from the place of employment. An employee, working in Norfolk on weekdays, injured on Sunday on the highway, through the negligence of the employer, *would be entitled neither to compensation under the Act nor damages at law. He would be remediless.*

Such a result would be to construe the Act strictly against the employee and not in his favor. Moreover, it would be violative of the principle that an existing common-law remedy is not to be taken away by a statute unless by direct enactment or necessary implication.

*Our conclusion is that the Workmen's Compensation Act is exclusive in so far as it covers the field of industrial accidents, but no further. To the extent that the field is not touched by the statute, we think that the legislature intended that the employee's common-law remedies against his employer are to be preserved unimpaired.*

Id. 20 S.E.2d at 533–34 (emphasis added).

The *Griffith* Court thus recognized that the Act itself is essentially an endeavor to achieve a humane compromise between labor and industry with give and take on both sides. In situations where the purposes of such compromise are not fulfilled, and perhaps even thwarted, the Act will not stand as a bar to a civil suit for damages. In other words, both sides of the coin must be given the benefit of their bargain before such bargain will be enforced. And, of course, situations not covered by such bargain will not be affected thereby.

This rationale of *Griffith* was followed in the opinion of *Perrin v. Brunswick Corporation*, 333 F.Supp. 221 (W.D.Va.1971), in which Chief Judge Widener of the United States District Court for the Western District of Virginia held in pertinent part that:

[i]n view of the finding of the Industrial Commission that bronchitis *is an ordinary disease of life which is not compensable under the Virginia Workermen's Compensation Act, Perrin's common law remedies against his employer are preserved unimpaired, since this condition is not touched by the statute.* Griffith v. Raven Red Ash Coal Co., 179 Va. 790, 20 S.E.2d 530 (1942). As stated in the *Griffith* case, quoting Ruling Case Law, *"But if for any reason the statute is inapplicable to the case, the employee may have recourse to his common law remedy."* 179 Va. 790, 798, 20 S.E.2d 530, 534.

*Perrin*, 333 F.Supp. at 224 (emphasis added).

Thus, in light of the above reasoning, it appears to this Court that the Supreme Court of Virginia would hold that the Virginia Workers' Compensation Act is not a bar to the Plaintiffs bringing a civil action to recover damages for their exposure if an exposure to toxic chemicals is not a compensable injury or disease under the Act. Sound policy reasons indeed support this result. As noted above, the essential justification for making Workers' Compensation an exclusive remedy is a trade-off or compromise: the employee gives up the right to sue the employer in tort in exchange for the employer's abandonment of the defenses of contributory negligence, assumption of risk and the fellow servant doctrine.[11]

Yet here, if the Virginia Workers' Compensation Act does not recognize an exposure to toxic chemicals as a compensable injury or disease and the Plaintiffs are

---

**11.** It was a recognition of these policy reasons which largely led District Judge Ellis in *McGreevy* to hold that the Supreme Court of Virginia would adopt an intentional tort exception. This Court also recognizes and relies on the importance and relevance of such policy reasons, however, at a more basic level.

In part, Judge Ellis surmised in *McGreevy* that without adopting an intentional tort exception "... in certain instances, there would be no remedy at all for an injured employee. For example, 'an employer ... who intentionally disfigures an employee without affecting the employee's ability to work would not be subject to liability under the [WCA] or, under [defendant's] analysis, subject to civil suit.'" *McGreevy*, 690 F.Supp. at 472, quoting *Beauchamp v. Dow Chemical Co.*, 427 Mich. 1, 398 N.W.2d 882, 889 (1986). It is this anomaly, however, that leads this Court under the rationale of *Griffith* and its progeny to reach the more elementary conclusion that the Worker's Compensation Act is not applicable in the first instance to such a situation.

barred by the Act from bringing a common law action, they will in essence be deprived of their tort remedy without receiving any concomitant benefit. Such an outcome certainly cannot be an intended result of the humane and remedial purposes of the Act. Rather in such a situation the Act simply does not apply and its exclusivity provision is therefore inapplicable.

A further examination of the Act is therefore required to determine whether an exposure to toxic chemicals constitutes a compensable injury or disease under its provisions. And, as noted above, only if such an exposure does constitute a compensable injury or disease is the question of whether the Virginia Supreme Court would recognize an intentional tort exception to the Act's exclusivity provision relevant for obviously neither the Court nor the Legislature need create an exception to the Act where the Act does not apply in the first place.

Just as with the West Virginia Workers' Compensation Statute, the only reference under the Virginia Workers' Compensation Act to an exposure such as that claimed by the Plaintiffs is in relation to its coverage of occupational diseases. Virginia Code § 65.1–46 (1970) [12] states:

> As used in this Act, unless the context clearly indicates otherwise, the term "occupational disease" means a disease arising out of and in the course of employment. No ordinary disease of life to which the general public is exposed outside of the employment shall be compensable, except:
>
> (1) When it follows as an incident of occupational disease as defined in this title; or
>
> (2) When it is an infectious or contagious disease contracted in the course of employment in a hospital or sanitarium or public health laboratory.
>
> A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:
>
> (1) A direct causal connection between the conditions under which work is performed and the occupational disease.
>
> (2) *It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment,*
>
> (3) It can be fairly traced to the employment as the proximate cause,
>
> (4) *It does not come from a hazard to which workmen would have been equally exposed outside of the employment,*
>
> (5) It is incidental to the character of the business and not independent of the relation of employer and employee, and
>
> (6) It must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

(emphasis added).

Virginia Code § 65.1–52 contains the Act's limitation periods for the filing of claims for occupational diseases and also defines an "injurious exposure" as "an exposure to the causative hazard of such disease which is reasonably calculated to bring on the disease in question." Such definition has remained unchanged since the 1962 amendment to the section. The Virginia Supreme Court has explained that:

> [a] claimant can meet this statutory standard by establishing either actual causation or aggravation of the disease or by showing that the exposure was of such duration and intensity that it generally causes the disease in question, even though actual causation or aggravation cannot be established in the claimant's case. The statutory definition was intended to relieve claimants of the burden of establishing actual causation in cases where such proof is difficult, if not impossible.

---

**12.** Virginia law also dictates that it is the law existing at the time of the injury which applies. *See Roller v. Basic Const. Co.,* 238 Va. 321, 384 S.E.2d 323 (1989); *Blue Diamond Coal Co. v. Pannell,* 203 Va. 49, 122 S.E.2d 666 (1961). Va. Code § 65.1–46 was amended in 1986. Therefore any exposure which occurred after such amendment took effect would be governed by it. However, because such amendment neither made any substantive nor significant changes other than creating a separate section regarding the coverage for ordinary diseases of life, see Va.Code §§ 65.1–46 and 65.1–46.1 (1986), the Court will not address them separately.

*Caudle–Hyatt, Inc. v. Mixon,* 260 S.E.2d 193, 196 (Va.1979).

■ It is thus apparent after an examination of the above sections in their full context that the occupational exposure to a toxic chemical in and of itself is not a compensable injury or disease under the Virginia Worker's Compensation Act. Rather, just as under the West Virginia Statute, it is the disease, if any, caused by such exposure that may be compensable under the Act, not the exposure itself. *See Barth v. Firestone Tire and Rubber Co.,* 673 F.Supp. 1466 (N.D.Cal.1987); *but see Gulden v. Crown Zellerbach Corp.,* 890 F.2d 195 (9th Cir.1989).

It is therefore the opinion of this Court that the Virginia Supreme Court would hold that the Act's exclusivity provision is not a bar to the Plaintiffs bringing a civil suit for damages. Whether or not such an exposure is a legally actionable injury under the common law, however, is a different question. Up until this point, the Court has essentially assumed for the purpose of its analysis concerning the applicability or non-applicability of the West Virginia and Virginia Workers' Compensation Acts that

such an exposure is a legally actionable injury under the common law, it is now to this question that the Court must turn.[13]

But before doing so, the Court wishes to briefly clarify the scope of its holding concerning the non-applicability of such Acts. In essence, the Court is simply noting that if an employee has actually suffered a legally actionable "injury," and such an "injury" is not recognized under the Workers' Compensation Act as a compensable injury or disease, the Act is not applicable to the situation and its exclusivity provision not a bar to the employee bringing a civil suit for damages.[14] Obviously, this holding does not apply to a situation where an alleged injury, if proven, is one compensable under the Act and an eligible employee has simply failed to establish that he has suffered such an injury and thus is not entitled to any compensation under the Act.

## II. HAVE THE PLAINTIFFS SUFFERED AN ACTIONABLE INJURY UNDER THE COMMON LAW OF WEST VIRGINIA AND/OR VIRGINIA?

As noted above, the Occupational Plaintiffs and Spouse Plaintiff Thompson claim

---

**13.** As noted earlier, a significant degree of confusion existed before the hearing on the Defendant's motion for summary judgment as to what "injury" the Plaintiffs were claiming. The Defendant contended that if the Occupational Plaintiffs were alleging a mental or emotional injury, such an injury must be relegated to a claim under the West Virginia Workers' Compensation Statute. *See Breeden v. Workmen's Compensation Com'r,* 168 W.Va. 573, 285 S.E.2d 398 (1981). It appears to this Court that such an injury could also be compensable under the Virginia Workers' Compensation Act. *See Burlington Mills Corporation v. Hagood,* 177 Va. 204, 13 S.E.2d 291 (1941); *Haigh v. Matsushita Elec. Corp. of America,* 676 F.Supp. 1332, 1353 (E.D.Va.1987).

Of course, Plaintiffs' counsel insisted adamantly at such hearing that their injury was their exposure and that they were only seeking recovery for emotional distress as an element of their damages. Because this Court believes that the Occupational Plaintiffs would need to satisfy the same requirements of the tort of outrageous conduct, as will be discussed infra, to establish part of their burden in a Mandolidis-type action which is based solely on an emotional or mental injury rather than on a physical injury, and would fail in that regard for the reasons discussed infra, the Court does not consider this

dispute conclusive and has instead proceeded up until this point assuming that the Occupational Plaintiffs' exposure was their injury.

Of course this proposition assumes they would be entitled to bring a Mandolidis-type action (Defendant contends that the West Virginia Worker's Compensation Statute only permits such an action for a serious *physical* injury or death). It should, however, be noted that even assuming they are entitled to bring such an action based solely on emotional injuries, the Occupational Plaintiffs would be barred from maintaining such an action here for their emotional injuries which have been caused by their occupational exposure in West Virginia due to this Court's alternative holding that they were required to file and proceed with compensation claims under the West Virginia Workers' Compensation Statute to determine what offset the Defendant is entitled to receive.

**14.** The Court believes that this result necessarily follows from an examination of the language of the Acts and the decisions interpreting such language when read in their full context. As such, the holding is in no way an attempted expansion of the existing law of these states, rather it is a faithful application of such states' settled law.

that their exposure to toxic chemicals constitutes a physical injury. They allege that they have suffered exposure to these chemicals in both West Virginia and Virginia.[15] Because of this "injury" these Plaintiffs claim they are entitled to receive as elements of their damages compensation for their emotional distress and for the medical monitoring which they allege will be required throughout the remainder of their lives.

## EMOTIONAL DISTRESS ELEMENT

■ West Virginia and Virginia both recognize the recovery of damages for emotional distress in three separate and distinct situations: (1) where the emotional distress accompanies or contemporaneously follows an actual physical injury caused by impact upon the occurrence of the tort; (2) where there is no impact and physical injury accompanying the emotional distress, but a physical injury afterwards results from the emotional distress which in turn was caused by the defendant's wrongful act; and (3) where the defendant commits an intentional nonphysical tort which causes emotional distress. *Harless v. First National Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982); *Monteleone v. Co-operative Transit Co.,* 128 W.Va. 340, 36 S.E.2d 475 (1945); *Mullins v. The Pittston Company,* No. 86–0011 (S.D.W.Va. Oct. 31, 1986); *Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145 (1974); *Hughes v. Moore,* 214 Va. 27, 197 S.E.2d 214 (1973).

■ It is clear based on the contentions of Plaintiffs' counsel at the hearing held on the Defendant's motion for summary judg-

ment, noted at length above, that it is the first category of recovery they seek. Thus, Plaintiffs are seeking recovery for emotional distress as a claim "parasitic" to their "host" claim of damages for the intentional or negligent infliction of their physical injuries, i.e., exposure. *See Payton v. Abbott Labs,* 386 Mass. 540, 437 N.E.2d 171 (1982). The question the Court must resolve therefore is whether they have suffered an actionable physical injury upon which they can attach their claim for emotional distress as an element of their damages. In essence, is the exposure to toxic chemicals an injury under the common law of West Virginia or Virginia. It is the opinion of this Court that under the common law of the States of West Virginia and Virginia, such an exposure is not an actionable injury.

In *Locke v. Johns–Manville,* 221 Va. 951, 275 S.E.2d 900 (1981), the Virginia Supreme Court was faced with the question of determining when a cause of action accrued for the purposes of the plaintiff's claim that he was suffering from the disease of mesothelioma which he alleged had resulted from his inhalation of asbestos particles. The defendants there contended that such cause of action had accrued at the time the plaintiff had been injuriously exposed to the asbestos particles rather than at the time of manifestation of the disease, and, therefore, that the plaintiff was barred from bringing the action by the applicable statute of limitations.

The Virginia Supreme Court first noted that:

**15.** Spouse Plaintiff Thompson who has never been employed by the Defendant would obviously not be barred by the Worker's Compensation Acts from bringing her civil suit for damages.

Several of the Occupational Plaintiffs also claim that they took PCB oil or PCB contaminated material home with them for their personal use with the knowledge and consent of the Defendant. They thus allege that they were additionally exposed, i.e., injured, while neither performing their work-related duties nor while at their place of work; and, therefore, would not be barred by the Worker's Compensation Acts from bringing a civil action to recover damages for these exposures. Because such exposures cannot reasonably be deemed to have

arisen out of and in the course of their employment, this Court agrees that the Acts would not be a bar to a civil action based on these claims. *See Damron v. State Compensation Com'r,* 109 W.Va. 343, 155 S.E. 119 (1930); *Griffith v. Raven Red Ash Coal Co.,* 179 Va. 790, 20 S.E.2d 530 (1942).

Thus, even if this Court would have held that an exposure was a compensable injury under the Acts and that the employees were barred from bringing a civil action based on the deliberate intent of the Defendant to cause their occupational exposure because of their failure to file claims under the Acts, these Occupational Plaintiffs would not be barred from bringing a civil action based on these non-occupational claims.

[t]here is no right of action until there is a cause of action.... The essential elements of a cause of action, whether based on a tortious act or breach of contract, are (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that duty or right, and (3) harm or damage to the plaintiff as a proximate consequence of the violation or breach.... A cause of action does not evolve unless all of these factors are present. Specifically, without injury or damage to the plaintiff, no right of action accrues; stated differently, a plaintiff's right of action for damages for bodily injuries does not accrue until he is hurt.

. . . .

.    .    .    .    .

Code § 8.01–230 specifies that a cause of action for personal injuries shall be deemed to accrue and the prescribed limitation period shall commence to run from the date the injury is sustained. We construe the statutory word "injury" to mean positive, physical or mental hurt to the claimant, not legal wrong to him in the broad sense that his legally protected interests have been invaded. Thus, the running of the time is tied to the fact of harm to the plaintiff, without which no cause of action would come into existence; it is not keyed to the date of the wrongful act, another ingredient of a personal injury cause of action.

*Locke*, 275 S.E.2d at 904 (citations omitted).

The *Locke* Court then stated that the crucial question of the case became "[w]hen was the plaintiff hurt? Was he hurt when he breathed defendants' particles of asbestos no later than 1972 or was he hurt at some subsequent date, and, if then, was the date within two years of July 24, 1978, when suit was filed?"[16] *Id.* at 905. After a brief examination of the

medical evidence presented, the Court noted that:

... we are confronted in this case with a medical condition that does not arise at a specific point of time, as does a broken bone; mesothelioma results over a period of time, the beginning of the period being unknown. In other words, the cancer—the hurt—the harm—the injury—did not spring up at infliction of the wrongful act, that is, when the dust was inhaled no later than 1972. Rather, the tumor—the hurt—the harm—the injury—manifestly occurred before June of 1978 when the mesothelioma was diagnosed; the time it began to form before that date not being shown by the evidence. *Simply put, legally and medically there was no injury upon inhalation of defendants' asbestos fibers.*

*Id.*

It is thus clear that the Virginia Supreme Court regarded the inhalation or exposure to asbestos particles as the wrongful act of the defendants and not as the plaintiff's injury. The United States Court of Appeals for the Fourth Circuit followed the *Locke* decision in *Large v. Bucyrus–Erie Co.*, 707 F.2d 94 (4th Cir.1983), and held that the plaintiff's claim alleging that he was suffering from various ailments, including bilateral hearing loss, silicosis, industrial bronchitis and asbestosis, as a result of his exposure to excessive noise, silica dust, stone dust and asbestos dust was time barred by the applicable Virginia statute of limitations. The Fourth Circuit more specifically noted that:

*Locke* is on point with the present case factually and teaches that the statute runs from the date of injury determined to a medical certainty, not the date of last exposure. In cases based upon facts

---

**16.** It should be noted that since Plaintiffs' claim their exposure, rather than their emotional distress, is their injury, it is very likely that any of the Plaintiffs who suffered their last exposure to these chemicals in Virginia prior to 1985 would be barred from bringing this action by the applicable Virginia statute of limitations. The *Locke* Court was careful to note that it was not adopting a "discovery rule" but rather simply noting that a cause of action cannot exist until an injury occurs.

It should also be noted, however, that West Virginia Courts normally regard statute of limitations to be "procedural" rather than "substantive" and thus apply that of the forum. *See Selected Kentucky Distillers v. Foloway*, 124 W.Va. 72, 19 S.E.2d 94. As noted earlier, however, because this Court holds that such an exposure is not an actionable injury is not necessary to determine which statute would apply.

such as *Locke* and this one, the running of the statute is triggered by the injury even if it occurs years before the symptoms, not the date of the wrongful act, an entirely different element in the cause of action.

*Large,* 707 F.2d at 98.

The Plaintiffs in this case have presented no medical evidence which would tend to show that the above holding in *Locke* is not also applicable here, i.e., that the exposure is an injury and not merely the wrongful act of the Defendant. Rather the Plaintiffs simply contend that their exposure to these chemicals is a present injury because it may lead to their contraction of future diseases. Certainly such a contention is also applicable to the inhalation of asbestos particles. Indeed, today it appears that it is a medically and scientifically accepted fact that the exposure to asbestos particles can cause asbestosis and other more serious human health effects, such as mesothelioma, i.e., lung cancer. Here, however, Plaintiffs admit that it is not a medically or scientifically accepted fact that the exposure to these chemicals can cause any adverse human health effects other than chloracne, a benign reversible skin condition which none of the Plaintiffs claim to suffer.

Judge Staker of the United District Court for the Southern District of West Virginia held in *Pauley v. Combustion Engineering, Inc.,* 528 F.Supp. 759 (S.D.W. Va.1981), that the Supreme Court of Appeals of West Virginia would adopt the "discovery rule" in regards to asbestos-related diseases. Judge Staker reasoned that the West Virginia Supreme Court of Appeals:

... has continued to expand its adoption of the discovery rule in cases where the injury to the plaintiff is susceptible to concealment, through no fraudulent act on the part of the defendant, thus making it unreasonable, unfair and unjust to require the plaintiff to file his cause of action before he can reasonably discover his injury. A cause of action for damages for an asbestos-related injury, *an injury which often does not develop for at least fifteen or twenty years after exposure to asbestos products,* is analo-

gous to the plaintiff's actions in the aforementioned cases wherein the highest court adopted the discovery rule.

*Pauley,* 528 F.Supp. at 764–65 (emphasis added).

While the issue was not expressly addressed, it is implicit in the *Pauley* decision that the mere exposure, itself, did not constitute the plaintiff's injury but rather the defendant's wrongful act. Such a discovery rule had also earlier been adopted by the United States Supreme Court in regards to a federal employee who had brought a F.E.L.A. action alleging that he had contracted silicosis as a result of his occupational exposure to silica. *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). The Fourth Circuit applied the *Urie* holding in *Young v. Clinchfield,* 288 F.2d 499, 502 (4th Cir.1961) ("A rule of law that focuses on the occurrence of the wrongful act [exposure to silica dust] in determining when the cause accrued is totally inapplicable in such a case."). Other decisions applying such a discovery rule to toxic tort cases abound and are too numerous to mention.

In *Schweitzer v. Consolidated Rail Corp. (Conrail),* 758 F.2d 936 (3d Cir.1985), the United States Court of Appeals for the Third Circuit was faced with the task of determining when, as a matter of federal law, a F.E.L.A. cause of action exists for asbestos-related injuries. The Third Circuit reasoned that:

[i]t is true that the possible existence of subclinical asbestos-related injury prior to manifestation may be of interest to a histologist.... Likewise, the existence of such injury may be of vital concern to insurers and their insureds who have bargained for liability coverage triggered by "bodily injury." ... We believe, however, *that subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.*

Moreover, we are persuaded that a contrary rule would be undesirable as

applied in the asbestos-related tort context. *If mere exposure to asbestos were sufficient to give rise to a F.E.L.A. cause of action, countless seemingly healthy railroad workers, workers who might never manifest injury, would have tort claims cognizable in federal court. It is obvious that proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for those who do. Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purpose of tort law: the compensation of victims who have suffered. Therefore we hold that, as a matter of federal law, F.E.L.A. actions for asbestos-related injury do not exist before manifestation of injury.*

*Schweitzer,* 758 F.2d at 942.

The United States Court of Appeals for the Fifth Circuit has indicated its agreement with the above holding of *Schweitzer* in regards to asbestos-related diseases and has noted that "[i]n a sense, the injury in this case is the inhalation of asbestos fibers. It was not an actionable injury, however, meaning it was not legally cognizable, until at least one evil effect of the inhalation became manifest." *Jackson v. Johns–Manville Sales Corp.,* 781 F.2d 394, 412 (5th Cir.1986) (Court holding in part that when one evil effect of the inhalation appears a plaintiff may recover for all probable future manifestations as well).

The United States District Court for the Eastern District of Pennsylvania was confronted with the question of whether a present injury was required under Pennsylvania law to obtain a recovery in toxic tort litigation in the case of *In re Paoli R.R. Yard PCB Litigation,* 706 F.Supp. 358 (E.D.Pa.1988). The defendants in that action contended that a present injury was required as a matter of law before the plaintiffs could recover for fear of future harm, i.e., emotional distress, and increased risk of future harm.

The plaintiffs responded that Pennsylvania law only required "some physical injury or some medically-identifiable effect."

Since they could demonstrate that they had PCBs in their bodies, the plaintiffs argued that they had established a "medically-identifiable effect" and therefore should not be barred from recovering for their fear of future harm. They additionally contended that the defendants' summary judgment motion regarding their claim for increased risk of future harm should also be denied since it was one of their medical experts opinion that PCBs could cause cancer of the liver and other diseases. *In re Paoli,* 706 F.Supp. at 375.

In response to these contentions, the Court stated:

I believe that to make out a case the plaintiffs would need to prove four elements: 1) that defendants released PCBs into the environment; 2) that plaintiffs somehow ingested these PCBs into their bodies; 3) that plaintiffs have an injury; 4) that PCBs are the cause of that injury.

. . . . .

Regarding the third issue, *plaintiffs must point to some health problem that they have or they are out of court under Pennsylvania law. If the best they can do is possibility of future harm, fear of future harm, emotional distress, or the mere fact that they have PCBs in their body, then those plaintiffs cannot recover.* The expert testimony we have regarding the possibility of future harm is insufficient for the Pennsylvania Supreme Court.

Id. (emphasis added).

There are numerous relevant decisions which this Court finds persuasive that have either specifically or implicitly held that the exposure to toxic substances is not a physical injury upon which emotional distress damages may be recovered. Such decisions include the following: *Adams v. Johns–Manville Sales Corp.,* 783 F.2d 589 (5th Cir.1986) (Court noting that plaintiff's claim for mental anguish damages failed under Louisiana law because he failed to establish that he sustained an injury resulting from his exposure to asbestos products); *Eagle–Picher Industries, Inc. v. Cox,* 481 So.2d 517 (Fla.Dist.Ct.App.1985) (Court finding that the inhalation of asbes-

tos is an impact but not a physical injury under Florida law); *Sypert v. United States,* 559 F.Supp. 546 (D.D.C.1983) (Court finding that while exposure to tubercle bacilli was an impact it was not a physical injury as required under Virginia law); *Payton v. Abbott Labs,* 386 Mass. 540, 437 N.E.2d 171 (1982) (implicit in Court's analysis that plaintiffs' in utero exposure to diethylstilbestrol was not a physical injury or harm under Massachusetts law); *Bubash v. Philadelphia Electric Co.,* 717 F.Supp. 297 (M.D.Pa.1989) (Court holding that the mere exposure to radiation is not the equivalent of a physical injury under Pennsylvania law); *Plummer v. Abbott Laboratories,* 568 F.Supp. 920 (D.R.I.1983) (Court holding that plaintiffs' ingestion of diethylstilbestrol and resultant alleged increased risk of contracting cancer does not per se constitute a physical injury under Rhode Island law).[17]

In light of the above discussion, it is the opinion of this Court that the Plaintiffs have failed to alleged a physical injury which would allow them to recover "parasitic damages" for their emotional distress under the first category of permissible recovery, outlined above, which is recognized under the law of West Virginia and Virginia. Because the Plaintiffs have also not suffered any physical manifestations or injuries as a result of their emotional distress, it is additionally clear that they may not recover under the second category of permissible recovery.

However, the Plaintiffs' contended in their memorandum in opposition to Defendant's motion for summary judgment that they are entitled to damages for the intentional infliction of emotional distress. Although they did not specifically advance this argument at the hearing held on the Defendant's motion for summary judgment, the Court still feels that this argument, as an alternative ground for recovery, deserves attention. Therefore an ex-

amination of the relevant law in this regard as applied to the facts of this case is required.

The West Virginia Supreme Court of Appeals addressed the areas in which a recovery for emotional distress would be permissible under the law of West Virginia in *Harless v. First National Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982). The Court noted that a third category of permissible recovery existed " '. . . where there was no impact and no physical injury caused by the defendant's wrong, but an emotional or mental disturbance is shown to have been the result of the defendant's intentional or wanton wrongful act.' " *Harless,* 289 S.E.2d at 701, quoting *Monteleone v. Co–Operative Transit Co.,* 128 W.Va. 340, 347, 36 S.E.2d 475, 478 (1945).

The Court noted that the clearest categories of torts which allow such recovery are those of the traditional nonphysical intentional torts. After examining the elements of the tort of retaliatory discharge, the Court determined that such tort carried a sufficient indicia of intent to permit the recovery of damages for emotional distress. *Id.* 289 S.E.2d at 701–02. Here, of course, the Plaintiffs have not alleged a traditional nonphysical intentional tort, however, the *Harless* Court also recognized a cause of action for the intentional infliction of emotional distress. The Court acknowledged that "[a] number of commentators have noted that the tort of outrage is merely an extension of the right to recover damages for emotional distress into the areas involving nontraditional intentional torts. . . ." *Id.* 289 S.E.2d at 704.

The *Harless* Court noted that:

[t]he tort of outrageous conduct or intentional infliction of emotional distress permits the recovery of damages for emotional distress arising out of extreme and outrageous conduct intentionally or reck-

---

17. There are also a significant number of decisions in which claims for increased risk of contracting future illnesses have been disallowed by courts because plaintiffs have failed to demonstrate that they have suffered a present injury. While Plaintiffs here have not alleged a claim for increased risk per se and such holdings

therefore are not exactly on point, it is clear in such cases, either explicitly or implicitly, that the mere exposure does not itself constitute a present injury. *See Amendola v. Kansas City Southern Ry. Co.,* 699 F.Supp. 1401 (W.D.1988), for a fairly recent compilation of such decisions.

lessly caused by the defendant as indicated in Section 46 of the Restatement (Second) of Torts: "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

Id. at 703.

While recognizing such tort, the *Harless* Court referred to the decision of *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974). In *Womack*, the Virginia Supreme Court held that:

We adopt the view that a cause of action will lie for emotional distress, unaccompanied by physical injury, provided four elements are shown: One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and emotional distress. Four, the emotional distress was severe.

*Womack*, 210 S.E.2d at 148.

In defining the parameters of the tort, the *Harless* Court referred to Comments d and j of the Restatement (Second) of Torts. *Harless*, Id. 289 S.E.2d at 703–04 n. 20. Such comments state in pertinent part:

d. Extreme and outrageous conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

.    .    .    .    .

j. Severe emotional distress. The rule stated in this Section applies only where the emotional distress had in fact resulted, and where it is severe. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved

. . . .

.    .    .    .    .

It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.

▪▪▪ Obviously, it is clear that law of both West Virginia and Virginia require that the Defendant acted intentionally or recklessly, that such action was extreme and outrageous, and that such action has caused the plaintiff to suffer severe emotional distress. Without specifically determining whether there is evidence of a sufficient nature upon which a jury could reasonably conclude that the defendant acted intentionally or recklessly and that such action was extreme and outrageous, the

Court agrees with the Defendant's contention that the Plaintiffs have presented absolutely no evidence to establish that they have suffered severe emotional injury. Rather they have merely alleged that they are apprehensive about the possibility of contracting future diseases.

Plaintiffs have not referred this Court to any evidence of a sufficient nature under Federal Rules of Civil Procedure 56(c) and (e) which could establish that they have suffered severe emotional distress. The most exacting description provided to this Court as to the emotional distress suffered by the Plaintiffs was furnished in the guise of oral argument at the hearing held on the Defendant's motion for summary judgment where it was stated that:

> MR. LEES:      ...
>
> The evidence in this case will be the plaintiffs, once they discovered they had been exposed to a toxic chemical and what that chemical can do to you, have sustained emotional distress in the sense of the worrying, the sleeplessness, the nausea, whatever else as a result of their worrying about the genetic defects, the cancer, all those type of things.
>
> .     .     .     .     .
>
> THE COURT: Well, are you saying, then, that the evidence that you would have in support of the emotional distress element, if that's what you want to call it, element of damages, would be the testimony of the plaintiffs themselves?
>
> MR. LEES: Yes.
>
> THE COURT: There will be no medical evidence in support of that?
>
> MR. LEES: No, we did not purposely send these people to psychiatrists or hire experts to do the post traumatic stress syndrome and all of that.

Transcript at 17–18.

Mere conclusory allegations or contentions of Plaintiffs' counsel are not sufficient to withstand a summary judgment motion. Evidence must be presented in a form sufficient under Rule 56 which would permit a jury to reasonably conclude that the Plaintiffs have suffered *severe* emotional distress. It would certainly appear that Plaintiffs need not show that they have suffered a physical injury as a result of their emotional distress to establish that such distress is severe, nor perhaps do they need to obtain psychiatric or medical testimony corroborating that their distress is severe—although such would certainly be helpful to say the least—so as to succeed with their claim at trial. However, to survive this summary judgment motion, they must present to this Court evidence in a form sufficient under Rule 56 so as to enable it to conclude that a jury could reasonably find that they have suffered not only emotional distress but severe emotional distress, and this they have failed to do.[18]

As noted earlier, it is the nonmoving party's burden to come forward with evidence to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. Where the nonmoving party fails to do so the moving party is "entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552. It is the Court's opinion that the Defendant here is entitled to such a judgment on this issue.

## MEDICAL MONITORING ELEMENT

Plaintiffs have also alleged that they are entitled as an element of their damages to recover for the costs of medical monitoring. More specifically, the Plaintiffs contend that a claim for medical monitoring seeks to recover the cost of periodic medical examinations intended to monitor Plaintiffs' health and facilitate early diagnosis and treatment of future disease which may be caused by their exposure to toxic chemicals. They contend that several jurisdictions have in recent years recognized a cause of action for medical surveillance where plaintiffs have been exposed to toxic chemicals.

---

**18.** The Court also tends to agree with the Defendant that Plaintiffs themselves have implicitly argued that their distress is not severe in their attempt to distinguish their claims from those raised in *Breeden,* supra, so as to establish that they would not be compensable under the West Virginia Worker's Compensation Statute.

The Defendant is correct in noting that the law of West Virginia allows a plaintiff to recover the cost of reasonable and necessary future medical and hospital services where the evidence establishes that such future expenses are reasonably certain to be incurred as a result of an injury of the plaintiff which was proximately caused by the defendant's actions. *See Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974); *Long v. City of Weirton*, 158 W.Va. 741, 214 S.E.2d 832 (1975); *Ellard v. Harvey*, 159 W.Va. 871, 231 S.E.2d 339 (1976). Virginia law appears to be in accord with this principle. *See Hailes v. Gonzales*, 207 Va. 612, 151 S.E.2d 388 (1966); *Minnix v. Hall*, 211 Va. 512, 178 S.E.2d 519 (1971).

The Defendant contends that Plaintiffs may not recover such costs here for several reasons, including that they have not suffered an injury, such costs are not reasonable or necessary, and the incurrence of such costs have not been shown to a reasonable certainty. This Court agrees that the Plaintiffs may not recover such costs here because they have not suffered an actionable injury under the law of West Virginia and Virginia.

It appears to this Court that at least three of the cases cited by the Plaintiffs held that such recovery could be allowed on the same legal basis as would be permissible under the law of West Virginia and Virginia. The difference being, however, that those Courts found that their respective plaintiffs had alleged a sufficient injury under the applicable state law. *See Herber v. Johns–Manville Corp.*, 785 F.2d 79 (3rd Cir.1986) (pleural thickening and emotional distress; finding district court abused its discretion in excluding evidence on two elements of damages—

1. future costs of medical monitoring, 2. emotional anxiety); *Hagerty v. L & L Marine Services, Inc.*, 788 F.2d 315 (5th Cir. 1986) (dizziness, leg cramps, a persistent stinging sensation in feet and fingers, and emotional distress; reversing district court's grant of summary judgment); *Askey v. Occidental Chemical Corp.*, 102 A.D.2d 130, 477 N.Y.S.2d 242 (1984) (exposure; affirming supreme court's denial of class certification). While in another case,

relied on by the Plaintiffs, the court merely held that the plaintiff had alleged sufficient present injuries to survive a motion to dismiss for failure to state a claim; and although the court also noted that there was no remedy at law which would permit it to fashion an underlying remedy such as medical monitoring, it felt that the plaintiff had sufficiently alleged an irreparable harm so as to potentially bring the court's equitable relief power into play. *Barth v. Firestone Tire and Rubber Co.*, 673 F.Supp. 1466 (N.D.Cal.1987) (damage to immune system, presence of diseases in their latency period, and emotional distress).

However, in two of the cases cited by the Plaintiffs the respective courts held that the applicable state law did not require a present physical injury before a claim for medical monitoring could be maintained in toxic tort cases. *Ayers v. Jackson Township*, 106 N.J. 557, 525 A.2d 287, 76 A.L.R.4th 571 (1987) (reversing intermediate appellate court's denial of surveillance costs); *Merry v. Westinghouse Elec. Corp.*, 684 F.Supp. 847 (M.D.Pa.1988) (denying defendant's motion for partial summary judgment on recoverability of costs for future medical monitoring and on whether plaintiff had suffered physical injury or impact for purpose of obtaining emotional distress damages).

In *Ayers*, the Supreme Court of New Jersey held that:

... the cost of medical surveillance is a compensable item of damages where the proofs demonstrate, through reliable expert testimony predicated upon the significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, that such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary.

*Ayers*, 76 A.L.R.4th at 614. While in *Merry* the United States District Court for the Middle District of Pennsylvania held that under Pennsylvania law "... in order to recover medical surveillance costs, the

plaintiffs must prove: (1) exposure to hazardous substances; (2) the potential of injury; and (3) the need for early detection and treatment." *Merry,* 684 F.Supp. at 850. The Pennsylvania Supreme Court, however, has not decided this specific issue yet.

This Court believes that there are certainly meritorious reasons for allowing individuals to recover the costs of medical monitoring even where the individuals have not as yet suffered a demonstrable injury. The benefit of early diagnosis and treatment of diseases which might arise in the future from such individuals' exposure to hazardous substances can certainly not be doubted. And when other individuals or entities are responsible for such exposure, they should bare its costs. However, likewise, there are reasons which caution against imposing such liability on defendants where the exposed individuals have not shown both that they have suffered a present demonstrable injury and that the costs are reasonably certain to be incurred.[19]

There is little doubt that millions of people have suffered exposure to hazardous substances. Obviously, allowing individuals who have not suffered any demonstrable injury from such exposure to recover the costs of future medical monitoring in a civil action could potentially devastate the court system as well as defendants. Again, this is not to say that defendants who have caused such exposure should not pay the price. Certainly, theoretically both justice and common sense dictate that they should, however, practically there must be a realization that such defendants' pockets or bank accounts do not contain infinite resources. Allowing today's generation of exposed but uninjured plaintiffs to recover may lead to tomorrow's generation of exposed and injured plaintiff's being remediless. Thus to prevent one injustice from arising from another, the finite resources available must be spent both cautiously and wisely. This basic dilemma has plagued

tort law since its inception. Because of it, lines, sometimes arbitrary, have been drawn, and will continue to be drawn, to limit and delineate the when's and if's individuals will be allowed recovery for a wrong committed against them.

One thing is obvious, such line drawing for the States of West Virginia and Virginia is to be conducted by their respective legislatures and highest courts, not by a federal district court sitting with diversity jurisdiction. As noted above, this Court must apply the presently existing law of these States and not suggest or surmise its expansion. Where such law is unclear or unsettled, this Court must faithfully make an informed prediction as to how those States' highest courts would rule if the case were before them and may not do so according to its own sense of what the law should be. *See Kline v. Wheels by Kinney, Inc.,* 464 F.2d 184, 187 (4th Cir.1972).

In light of the presently existing law of these States, this Court cannot reasonably and faithfully predict that their highest courts would recognize the Plaintiffs' claims to recover the costs of future medical monitoring where these Plaintiffs have not suffered an actionable injury under such law. Moreover, as recently noted by the Fourth Circuit "[a] state claim which has not been recognized by state courts may well be a settled question of state law. Federal courts are permitted under *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and *[United Mine Workers v.] Gibbs,* 383 U.S. [715] at 715, 86 S.Ct. [1130] at 1130, [16 L.Ed.2d 218 (1966),] to rule upon state law as it presently exists and not to surmise or suggest its expansion." *Washington v. Union Carbide Corp.,* 870 F.2d 957 (4th Cir.1989).

This holding of *Washington* was even more recently reaffirmed in the unpublished Fourth Circuit opinion of *Tritle v. Crown Airways, Inc., et al.,* (4th Cir.1990)

---

**19.** Such an exposed plaintiff "... suffers, since '[l]ike the sword of Damocles [plaintiff] knows not when it will fall.' ... But, if Damocles supplies the reason for permitting recovery, Pandora supplies the reason for at least limiting recovery." *Eagle–Picher Industries, Inc. v. Cox,* 481 So.2d at 527, quoting *Alley v. Charlotte Pipe and Foundry Co.,* 159 N.C. 327, 331, 74 S.E. 885, 886 (1912) (Court discussing reasons for limiting "fear of" damages, i.e., emotional distress.) This Court believes that such reasoning also applies in regards to limiting the recoverability of future medical monitoring costs.

[900 F.2d 256 (table) ] (Since such opinion is unpublished it is of course not binding precedent in the Fourth Circuit. I.O.P. 36.-5, 36.6). In *Tritle*, the Court stated that "[t]oday, we reaffirm our decision in *Washington*, and hold that a state claim which has not been recognized by that jurisdiction's own courts constitutes a settled question of law, which will not be disturbed by this court absent the most compelling of circumstances. For as this court concluded in *Washington*, we generally do not have the authority 'to surmise or suggest its expansion.'" *Tritle*, No. 89–2161, slip op. at 10–11.

For all the reasons discussed above, it is the opinion of this Court that the Defendant is entitled to summary judgment as a matter of law on this issue also.

## LOSS OF CONSORTIUM

It is clear that the Defendant is also entitled to summary judgment on the Spouse Plaintiffs' claims for loss of consortium for under the law of West Virginia such claims are derivative of their husbands' claims. *See McVey v. Chesapeake and Potomac Telephone Company*, 103 W.Va. 519, 138 S.E. 97 (1927); *Parsons v. Shoney's, Inc.*, 580 F.Supp. 129 (S.D.W.Va. 1983). While under Virginia law, it would appear that a spouse has no right to maintain an action for loss of consortium. *See Carey v. Foster*, 345 F.2d 772 (4th Cir. 1965).

## MOTION FOR CERTIFICATION

Several days after this Court verbally informed the parties on August 6, 1990, that it was granting the Defendant's motion for summary judgment, the Plaintiffs filed a motion to certify questions of West Virginia law. Both parties note in their briefs regarding the certification motion, that the decision of whether to certify a question(s) is greatly within the discretion of the Court. Because the Court realized that the particular state claim raised by the Plaintiffs has not been recognized in West Virginia or Virginia and that the highest courts of these States could possibly choose to extend their law so as to recognize such a claim should the opportunity to do so arise, the Court considered the possi-

bility of certification and expressly asked the parties for their thoughts on the matter at the hearing held on Defendant's motion for summary judgment. Transcript at 48.

It was obvious to the Court at such time that neither of the parties favored this alternative. Rather both parties felt confident of their respective positions and desired that this Court reach a determination on the motion for summary judgment based on its interpretation of the present state of the law. This Court reluctantly but properly did so. Both parties knew that one would lose. This Court cannot now in all fairness to the Defendant revoke its ruling because the Plaintiffs wrongly surmised as to the result this Court would reach.

■ Plaintiffs should have earlier considered the possible meritorious advantages to certification such as finality and judicial economy which they now so strenuously argue. It should additionally be noted that this is not a case where the Defendant sought a federal forum through removal from state court, rather it was the Plaintiffs who originally brought this action in federal court under our diversity jurisdiction. As stated by the Defendant:

The fact of the matter is that the plaintiffs waited until after all of the summary judgment briefs had been filed and the issue decided before even asking for certification. Now they want to re-brief the entire issue in front of the West Virginia Supreme Court [of Appeals] in the hopes that they will get a favorable result. If the plaintiffs think this Court is wrong, their relief should be in the Fourth Circuit, the Court of Appeals in their chosen forum.

Defendant's Response To Plaintiffs' Reply Brief In Support of Certification at 4.

It is hereby ORDERED that the Plaintiffs' motion for certification is DENIED as being untimely.

The Court finds additional support for this conclusion in the *Washington* and *Tritle* cases referred to earlier. More specifically, in *Washington*, the Fourth Circuit faced the question of whether a district court had erred in dismissing a pendent

state law claim on the merits without first determining whether there was federal preemption of the state law claim. The *Washington* Court noted:

We must still address the application of the discretionary approach in this case. The district court, the panel majority, and the dissenting opinion all agree that appellant's purported state-law claim has not been recognized in West Virginia. The dissenting opinion characterizes plaintiff's claim as "novel" and concedes that it "has not been specifically recognized in state law." The dissent then asserts, however, that it is beyond the discretion of a federal district court to dismiss the state-law claim with prejudice. Under this view, every cause of action in tort, no matter how speculative, presents an unsettled question on the frontier of state law which must be presented to state courts for resolution. We disagree. A state claim which has not been recognized by state courts may well be a settled question of state law. Federal courts are permitted under *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and *[United Mine Workers v.] Gibbs,* 383 U.S. [715] at 715, 86 S.Ct. [1130] at 1130, [16 L.Ed.2d 218 (1966)] to rule upon state law as it presently exists and not to surmise or suggest its expansion.

*Washington,* 870 F.2d at 962.

In *Tritle,* the Fourth Circuit again held that a district court had not abused its discretion in deciding a state law claim on its merits without first deciding whether such claim was federally preempted. The Court stated:

This case illustrates one of the tremendous drawbacks of federal diversity jurisdiction. In our view, the question which is before this Court is perhaps best answered by the courts of West Virginia. There can be no doubt that the jurists of that state are better situated to decide whether to extend the *Harless* cause of action for retaliatory discharge to employees such as Tritle.

More importantly, we believe that our earlier decision in *Washington* constrains us from recognizing such a new cause of action.... Today, we reaffirm our decision in *Washington,* and hold that a state claim which has not been recognized by that jurisdiction's own courts constitutes a settled question of law, which will not be disturbed by this court absent the most compelling of circumstances. For as this court concluded in *Washington,* we generally do not have the authority "to surmise or suggest its expansion." We dismiss as specious Tritle's claim that such a ruling will largely preclude the West Virginia courts from ever reaching this question because of the removal jurisdiction of the federal courts. We are fully aware of the ingenuity of attorneys in selecting and retaining the fora of their choosing, and of the ability of state courts to reach and decide issues of great moment and concern to their respective jurisdictions.

*Tritle,* No. 89–2161, slip op. at 10–11.

As noted above, this Court believes that these holdings, while not exactly on point, support both its decision to grant summary judgment and its decision to deny certification. Certainly their analysis and reasoning appear relevant. This Court no doubt believes that the claims raised by the Plaintiffs before it would have been best decided by the courts of the States of West Virginia and Virginia with the parties' right of appeal leading perhaps ultimately to the States' highest courts which would have the power to extend, if at all proper, their law to recognize such claims. However, Plaintiffs brought their claims in federal court. A federal court sitting with diversity jurisdiction must apply state law as it presently exists and may not "suggest or surmise its expansion." A federal court under the facts of this case would not appear to abuse its discretion in doing so, and denying a motion to certify, particularly in light of the other equitable considerations in this case referred to above.

## MOTION TO RECONSIDER AND/OR AMEND JUDGMENT

The Plaintiffs' motion for this Court to reconsider and/or amend its judgment is hereby ORDERED DENIED inasmuch as this Court has assumed that Spouse Plain-

tiff Thompson was exposed and does not find *Gulden v. Crown Zellerbach Corp.,* 890 F.2d 195 (9th Cir.1989), persuasive in light of this Court's analysis.

IT IS SO ORDERED.